## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

**CASEY REYNOLDS**                                                            **PETITIONER**

**VS.**                            **NO. 4:24-CV-00010 JM/PSH**

**DEXTER PAYNE, DIRECTOR,**
**Arkansas Division of Correction ("ADC")**                       **RESPONDENT**

## FINDINGS AND RECOMMENDATION

### INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge James Moody, Jr.  You may file written objections to all or part of this Recommendation.  If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation.  By not objecting, you may waive the right to appeal questions of fact.

### DISPOSITION

Petitioner Casey Reynolds ("Reynolds") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Reynolds is in ADC custody following his 2018 convictions in White County for two counts of kidnapping, aggravated assault on a family or household member, and third-degree domestic battery.  He received a

total term of 46 years' imprisonment.  Reynolds began the process of direct appeal but then filed a motion to dismiss the appeal.  That motion was granted in November 2018.

He then sought postconviction relief pursuant to Ark. R. Crim. P. 37.1, alleging four instances of ineffective assistance of trial counsel:  (1) failure to effectively communicate a plea offer and unreasonably recommending that Reynolds reject the offer; (2) failure to investigate and present evidence impeaching the credibility of the victims; (3) failure to investigate and present evidence about the contents of Reynolds' lost cell phone; and (4) failure to adequately cross-examine the victims.

The trial court conducted an evidentiary hearing and subsequently denied Rule 37 relief.  Reynolds appealed, and the Arkansas Court of Appeals affirmed the trial court in a March 1, 2023 opinion.  *Reynolds v. State*, 2023 Ark. App. 106.

Reynolds now seeks federal habeas corpus relief advancing the four claims of ineffective assistance raised in his Rule 37 proceeding.  Respondent Dexter Payne ("Payne") has responded, contending the petition should be dismissed with prejudice.  Doc. No. 6.  The Court agrees, and recommends dismissal and denial of relief.

## Analysis

When the state court has ruled on the merits of a petitioner's claims, as with all four claims advanced by Reynolds, a writ of habeas corpus may not be granted unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court."  28 U.S.C. § 2254(d)(1), (2).  The United States Supreme Court offers guidance in interpreting the statute:

> A state court decision will be "contrary to" our clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."  A state court decision will be an "unreasonable application of" our clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."  . . . Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable.

*Penry v. Johnson*, 532 U.S. 782, 792-93 (citations omitted).

The Arkansas Court of Appeals ably summarized the trial and the Rule 37 proceedings, cited the legal standard to be met, and addressed Reynolds' arguments:

## I. *Reynolds's Trial*

Reynolds was charged with committing two counts of kidnapping, one count of aggravated assault on a household or family member, and one count of third-degree domestic battery against two victims, DS and BB, both former girlfriends.

At Reynolds's trial, BB, who is 5'1" and in June 2017 weighed 120 pounds, offered the following testimony.  [in a footnote the opinion cited Reynolds' trial testimony that he was a bodybuilder at the time of his arrest].  In June 2017, she lived with Reynolds but was planning to leave him because he was cheating on her and physically, emotionally, and sexually abusing her. Reynolds controlled her by taking her phone and car keys, removing the battery from her car, not allowing her to have any other relationships, and never allowing her to be alone—even showering with her and remaining in the bathroom when she was using the toilet. On June 14, her friend, Jennifer Long, picked her up from Reynolds's house and took her to another friend's house, which made Reynolds very angry. Reynolds spoke with BB on the phone and convinced her to come home to pack her things. He picked her up from the friend's house, but as soon as she went inside Reynolds's home, he locked the door and told BB to go to the back room and get undressed. She was afraid he would beat her as he had done before, so she did as she was told. He locked her in the room and returned with a bag of zip ties, wire clippers, and a knife. He zip tied her wrists and ankles and threatened to cut her ear to ear across her face. He put the wire cutters in her nose and applied pressure and told her he was going to "wreck her face." At that point, Reynolds had a seizure and lost consciousness, which he had done before when he was "emotionally stressed." BB eventually made it to the bathroom to get nail clippers to cut the zip ties (she was afraid she would wake him if she took the wire clippers out of his hand.) She clipped the zip ties,

found Reynolds's phone in the kitchen, and called 911. Reynolds recovered from his seizure and entered the kitchen. BB told Reynolds she was calling an ambulance for him, which angered him again, and he had another seizure. He recovered from the second seizure, and slammed BB against the ground and the wall. He put a gun in her mouth and told her that he was going to kill her and himself. Before the police arrived, he punched himself to make it look like she had hit him. When the police arrived a few minutes later and knocked on the door, she ran from the home. Reynolds was arrested, and BB reentered the home and gathered her things to leave. Reynolds had hidden her keys and phone, but eventually she found them and left. A police officer told her to take Reynolds's phone "to look through" it to try to find evidence against him. BB could not use the phone, and she gave it to "a friend of a friend" to fix it so she could view the contents of the phone. She never saw the phone again.

On cross-examination, trial counsel pointed out the following inconsistencies in BB's testimony. In her statement to police, she did not mention that Reynolds told her take off her clothes or that he put a gun in her mouth (she said he put it to her head) or that he threatened to kill himself as well. BB did not tell officers that Reynolds hit himself to make it look like she had hit him, and she did not contradict him when he told the police she had hit him. When she filled out a form to request an order of protection the next day, BB did not state that Reynolds told her to take off her clothes. BB's recollection of clipping the zip ties with nail clippers was spotty, and she did not know if Reynolds had ever been treated for any kind of mental illness.

DS, also a former girlfriend, testified at the trial, and the following evidence was adduced from her testimony. DS moved in with Reynolds in January 2017, and he was controlling from the beginning. Reynolds made her send photos of herself when she left the house to prove where she was. When she took a lunch break at work and was able to look at her phone, there would be "ten texts, ten phone calls, you know, and I'm like crap, he's mad." Reynolds monitored her phone, would not allow her to have social media accounts, and eventually he took her phone away from her and broke it. Reynolds followed her in his car and drove past her work. He took her keys from her when she arrived home after work and accused her of cheating on him if she was late. He forbade her from talking to her

family and from having friends. During sex he was rough with her and left bruises on her body, even when she asked him to stop. Reynolds began physically abusing her, hitting her in the mouth and slapping her at first, then escalating to punching her. Once, he slammed her head into the kitchen floor, causing a large knot to form on her head. Reynolds told DS that he was going to "drain the blood off" with the needle he used to inject steroids and then put ice on her facial wounds. He would not allow DS to be alone in the bathroom, and on March 22, 2017, when she locked the bathroom door, he broke the door down. She burned his arm with a hot curling iron, and he took the curling iron from her and burned her arm with it. He threatened to insert the hot curling iron into her vagina. When she told him she was going to the police, he went into the garage to retrieve a bag of black zip ties and zip tied her arms and legs to a kitchen chair. He secured a zip tie across her mouth, and began pinching her thighs hard enough to cause bruises. To convince Reynolds to let her go, she told him that she loved him, accepted him as he was, they were both crazy, and "we could be crazy together." He released her from the chair, and she went to work. After speaking to her supervisor, DS went to the police station and filed a report against him, ending their relationship.

On cross-examination, trial counsel questioned DS about the inconsistencies in her account of the abuse, including that she did not mention any threat to burn her vagina with the curling or having a zip tie across her mouth in her report to the police. Counsel also cross-examined DS regarding her account of being zip tied to the chair, pointing out the difficulty of zip tying someone while also holding them still. Counsel questioned DS about the length of time they were together before she left, why she did not tell anyone about the abuse, and an incident when she and Reynolds and his new girlfriend were at a park at the same time, and DS appeared to be stalking and harassing them.

Sergeant Heather King, the officer who took DS's statement on March 22, testified that when DS came in the station, she was upset and "didn't know where to begin, where to start." Sergeant King took her statement that she had been beaten and held against her will and took photographs of DS's injuries. The injuries included bruises on her face, back, thighs, and lower leg; narrow ligature marks around her

wrists; and a burn mark on her arm. DS did not tell Sergeant King about burning Reynolds with the curling iron.

Detective Heather Meadows of the White County Sheriff's Office testified that she also saw DS on March 22 and helped her obtain a protective order. DS was "very emotional" and "visibly shaken," and Meadows explained that DS's injuries were "very commonly the type of injury used in a defense, you know, trying to keep somebody from hurting you." She also noted the burn on DS's arm and the ligature marks.

Reynolds testified about the night in June 2017 when the police came to his home and arrested him. He testified that BB's friend, Jennifer Long, came to the house with a gun and threatened him, and BB left with her. Later, after talking, he and BB agreed to work it out, and he picked her up from another friend's house. Reynolds denied that he held BB against her will when she returned with him to his home. He admitted that he took her phone and her keys because "she had called without me knowing and brought somebody over that was threatening my life, Ms. Long." He explained that BB willingly gave him her keys (which were on a pepper spray key chain) and phone, and he hid them. Reynolds testified that when the police arrived later that evening, he told them that BB hit him in the face, but they only arrested him and let her go. Reynolds contended that BB stole his phone, which was "full of evidence against [DS] and [BB] including "death threats, of violence, of everything that's happened between them, of both of them hitting me, both of them—I've caught [DS] making death threats on that phone." Reynolds explained that when they arrived home, before the police came, he recorded a video of them talking at the kitchen table. He testified that the video would have shown that she threatened him with serious bodily harm, at which point he "jumped up from the table." She chased him down the hall with a knife, and he wrestled it away from her. BB then allowed him to zip tie her, and he stated that he had zip ties for his drum set. Reynolds asserted that the photographs of the zip ties on the floor of the bedroom and elsewhere were "staged" by BB and her mother hours later when he was in jail. He stated that he never saw the phone again after that night, but there were phone records showing that BB used the phone and impersonated him on Facebook. Reynolds also explained that he and BB engaged in consensual bondage and rough

sex. He denied ever having a seizure but stated that he felt light headed that evening, and "she came around behind [him] and hit [him] in the jaw and knocked [him] into the floor, and [he] passed out for probably five minutes or so." When he awoke, she was on the phone with the police. He stated that the only mental-health issue he had was depression from being mentally abused by BB and DS. Reynolds testified that, despite the order of protection, BB still tried to contact him and harassed him. DS also harassed him and followed him in her car and followed him at the park, trying to provoke him.

Reynolds testified that he and DS also engaged in consensual bondage and rough sex. He stated that DS mentally abused him during their relationship, and she broke her own phone when she threw it at him. He explained that he had requested that she let him look through the phone when he tested positive for an STD and suspected her of cheating, so she threw the phone. He explained that DS was in the bathroom with the door locked, torturing his dog because she was angry with him, and he broke the door down because he could hear his dog crying out. When he kicked the door down, the curling iron fell on her and burned her. He denied threatening her with the curling iron. He denied refusing to allow either of his ex-girlfriends privacy in the bathroom. Reynolds stated that DS had gotten a black eye from roughhousing and wrestling, which they both enjoyed, and that she lied to the police that he had hit her. He stated that the ligature marks she showed to the police occurred during consensual rough sex days before.

At the conclusion of the evidence, the jury found Reynolds guilty of two counts of kidnapping, one count of aggravated assault on a household or family member, and one count of third-degree domestic battery and was sentenced to an aggregate term of forty-six years' incarceration in the Arkansas Department of Correction.

## II. *Rule 37 Petition*

On January 14, 2019, Reynolds timely filed in the trial court a petition for postconviction relief under Arkansas Rule of Criminal Procedure 37.1. With leave of the court, he filed an amended petition on April 25, 2019. In his petition, he alleged trial counsel was ineffective because counsel failed to (1) adequately communicate regarding the

State's plea offer and unreasonably recommended that he reject the offer; (2) move to sever charges under Ark. R. Crim. P. 22.2; (3) investigate and present a defense regarding the charges related to DS; [claims 2 and 3 were withdrawn] (4) investigate and present evidence impeaching DS's and BB's credibility; (5) investigate and present evidence regarding the content of the lost cell phone; and (6) adequately cross-examine BB and DS.

On January 30, 2022, the court held an evidentiary hearing on the petition. Trial counsel, John Wesley Hall, testified that he received a plea offer of ten years' incarceration from the State. Hall stated that he emailed the plea offer to Reynolds and believed that he told Reynolds about it over the phone. In the email, Hall told Reynolds, "Here's your bullshit plea offer. I say no." Reynolds responded, "I agree with that. If you feel confident too let's say no. It seems to me there [sic] trying to back up and not go to trial." Hall testified that Reynolds was adamant that he would not plea to something he did not do and insisted on his innocence. Hall recalled meeting with Reynolds, his girlfriend Felicia French, and his mother to prepare Reynolds for trial and explain the State's case against him. Hall stated that he makes a practice of explaining eligibility for parole, and he "soft sell[s]" plea offers because he believed "in client determinations. It's their life and when they insist upon innocence, I don't challenge them. I just tell them it's going to be tough for a jury to believe, if that's the case, ... some lawyers try to brow beat clients into pleas, and I don't." Hall explained that Reynolds "always insisted upon his innocence. If there was the slightest crack in that façade, I would've gone for it and tried to get him to come to that realization." Hall testified that Reynolds knew that the two victims, DS and BB, were going to testify that he abused them and dominated them, and they "talked at length" what the women had said and what the videos showed. Hall stated that he remembered explaining that the White County venue was more conservative than Pulaski County, and the jury was likely to view bondage sex negatively. Hall recalled emails about negative events involving the victims and others and previous consensual bondage sex between Reynolds and DS and BB. Hall explained, "I didn't ask the women [about] that for fear they would just deny it." Hall stated that there was a photograph of DS stalking Reynolds, and he could have called Reynolds's girlfriend, French, to corroborate the meaning of the photograph but did not because her testimony would have been self-

interested, and she would have been "seriously impeached." Hall testified that he did not try to have Reynolds's medical records admitted showing his "struggle with anxiety, depression and insomnia, caused by stress from the girls" because he did not believe it would change the outcome of the trial. Hall explained that there were emails describing BB's prior bad behavior—faking a pregnancy and a miscarriage, using Reynolds's cell phone while he was in jail to impersonate him on social media and in texts, and violating the no-contact order between hers and Reynolds. Hall explained that the jury would have considered bringing up the miscarriage evidence a "really cheap shot." He also explained that the no-contact order was on Reynolds, not BB, and it is common practice to violate no-contact orders and not particularly persuasive to juries. Ultimately, Hall decided not to elicit this potential testimony from the witnesses because "then the State could have recalled the two women, and they could have been crossed again—on rebuttal." Hall pointed out that Reynolds had already testified to the above information, and by not questioning the women about it, Reynold's testimony was unrebutted. Hall explained that, regarding the photographic evidence of consensual bondage between Reynolds and his ex-girlfriends possibly contained on the missing cell phone, he told Reynolds how to "download it from the cloud and get it back because from the cloud you can recover everything but the texts messages if it is an iPhone." Hall stated that in any event, DS and BB would have simply denied they had engaged in rough sex with Reynolds, or the jury would infer that just because it was consensual in the past did not mean that they were not victims of the crimes Reynolds was accused of. "Getting them to admit that there was bondage sex in the past wouldn't make the pictures of it relevant, it would be more prejudicial than relevant then."

Felicia French testified that she was present when Hall and Reynolds discussed the plea offer, and she remembered "Casey being willing to take a plea deal, just not wanting to serve a life sentence." French stated that she heard Reynolds state between ten to fifteen times that he would take the plea. French stated that she never heard Hall explain parole eligibility, and she testified that Hall mentioned that White County is conservative and that the jury would likely find the topic of bondage sex distasteful.

Reynolds testified at the hearing that he told Hall multiple times that he "was willing to take the plea deal if there was any chance that we couldn't win this." Reynolds stated that Hall never explained parole eligibility or "what would happen if we failed at trial. When I saw ten years, I thought it mean ten full years on there." Reynolds recalled that it was Hall's confidence of success and his own lack of understanding of parole eligibility that convinced him to reject the plea offer. He stated that he definitely would have accepted the plea if he had known he might serve only one-sixth of his sentence. Reynolds also testified about Hall's failure to cross-examine BB about his cell phone that she took the night he was arrested. He explained that there were many "pictures of [consensual] sexual activity with bondage. They were violent—," and there was video of DS threatening him. He explained that Hall had not investigated the contents of the phone sufficiently and "showed up completely unprepared from everything we sent him." [in a footnote, the Court commented the contents of the cell phone were never retrieved from the cloud, and the phone was never found]. The trial court held a follow-up hearing at which oral argument regarding the testimony and evidence adduced at the evidentiary hearing was discussed.

The trial court denied Reynolds's petition in an order entered September 17, 2021. Regarding Reynolds's first claim, *the trial court found that trial counsel adequately communicated with Reynolds about the State's plea offer*, finding that trial counsel informed Reynolds that White County has a large conservative and elderly population, and "the topic of rough sex and bondage wouldn't be received well by a jury." Moreover, the court found, as a resident of White County, Reynolds should have known that even without counsel's explaining it to him. The trial court found that Reynolds's statement that he told trial counsel on numerous occasions that he wanted to take the plea lacked credibility. The trial court credited trial counsel's testimony that Reynolds unequivocally maintained his innocence and noted that Reynolds still did not admit guilt. The trial court relied on trial counsel's testimony that he explained parole eligibility (though it is not required that counsel do so) and that the first offer of ten years was reasonable if Reynolds was guilty. The State made a second offer at the jury trial, and Reynolds declined the offer and maintained his innocence. The trial court concluded that trial counsel properly relayed the plea offers to Reynolds and advised him

of the evidence against him, and Reynolds failed to meet his burden of proving that because of trial counsel's error, he was denied a fair trial.

Next, the trial court rejected Reynolds's second claim (on appeal), *that trial counsel was ineffective because he failed to call as witnesses Lucas Butler, Will Cleveland, Brandon Mooney and Felicia French, who would impeach DS and BB.* The trial court found that the eighteen related allegations were not examples of ineffective assistance of counsel. One category of witness testimony related to the contents of Reynolds's missing cell phone. The trial court found that this evidence was testified about to the extent possible, or the proposed witnesses had no knowledge of the contents of the cell phone. Another category of testimony, BB's and DS's prior impeachable behavior and the testimony regarding the zip ties, was testified to at trial, considered a "cheap shot" by trial counsel that would not be well received by the jury, or was irrelevant to the issues presented at trial. Medical evidence that Reynolds had never suffered a seizure, as BB claimed he had, was elicited through Reynolds's testimony, and it was not erroneous to refrain from delving further into this information. The trial court held that the calling of witnesses is generally a matter of trial strategy, and Reynolds had not established that counsel was ineffective for not calling a named witness. The trial court relied on the summary of the testimony at trial and evidence that would have been admissible and found that Reynolds did not prove that any prejudice occurred because of counsel's decision not to call certain witnesses.

The trial court also denied Reynolds's third claim (on appeal), *that trial counsel was ineffective because he failed to investigate and present evidence regarding certain exculpatory content of Reynolds's cell phone.* The trial court noted that the phone had been lost and had never been in the State's possession as evidence. The court found that trial counsel told Reynolds and his girlfriend how to search the cloud for the cell phone's content that might be stored there, and counsel had no obligation to search for evidence the police investigators had not found. Moreover, trial counsel examined BB, eliciting from her that she had possessed the phone after Reynolds's arrest, she had given it to someone to fix, and she never saw the phone again. At the Rule 37 hearing, French and Reynolds's mother both testified that they had no firsthand knowledge of the content of the phone. The court found that

Reynolds failed to meet his burden of proof that counsel's conduct fell below an objective standard of reasonableness or committed an error that created such prejudice that Reynolds was denied a fair trial.

The trial court next considered Reynolds's fourth claim (on appeal), *that trial counsel was ineffective for failing to adequately cross-examine DS and BB regarding consensual bondage sex that they had engaged in with Reynolds.* The court rejected this claim, finding that the extent of cross-examination was a matter of trial strategy, and furthermore, there was testimony regarding DS and BB having engaged in rough sex with Reynolds.

The trial court entered an order denying the petition. Reynolds timely filed his notice of appeal, and this appeal followed.

### III. *Discussion*

#### A. Standard of Review and Applicable Law

"On appeal from a trial court's ruling on a petitioner's request for Rule 37 relief, this court will not reverse the trial court's decision granting or denying postconviction relief unless it is clearly erroneous. *Kemp v. State*, 347 Ark. 52, 55, 60 S.W.3d 404, 406 (2001). A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Prater v. State*, 2012 Ark. 164, at 8, 402 S.W.3d 68, 74.

"The benchmark for judging a claim of ineffective assistance of counsel must be 'whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' *Strickland* [*v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)]." *Henington v. State*, 2012 Ark. 181, at 3–4, 403 S.W.3d 55, 58. Pursuant to *Strickland*, we assess the effectiveness of counsel under a two-prong standard. First, a petitioner raising a claim of ineffective assistance must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *Williams v. State*, 369 Ark. 104, 251 S.W.3d 290 (2007). A petitioner making an ineffective-assistance-of-

counsel claim must show that his counsel's performance fell below an objective standard of reasonableness. *Springs v. State*, 2012 Ark. 87, 387 S.W.3d 143. A court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

Second, the petitioner must show that counsel's deficient performance so prejudiced petitioner's defense that he was deprived of a fair trial. *Id.* The petitioner must show there is a reasonable probability that, but for counsel's errors, the fact-finder would have had a reasonable doubt respecting guilt, i.e., the decision reached would have been different absent the errors. *Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Id.* Additionally, conclusory statements that counsel was ineffective cannot be the basis for postconviction relief. *Anderson v. State*, 2011 Ark. 488, 385 S.W.3d 783. As set forth below, we find that the trial court did not clearly err in denying Reynolds's Rule 37 petition and affirm.

1. *Failure to adequately communicate regarding the plea offer*

Defendants have a Sixth Amendment right to counsel, and that right extends to the plea-bargaining process. *Lafler v. Cooper*, 566 U.S. 156, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012). Where trial counsel's performance is deficient in recommending that the defendant reject a plea offer, the *Strickland* test is satisfied where the claimant shows a reasonable probability that, but for the defective performance, there is a reasonable probability that the plea offer would have been presented to the court, the court would have accepted its terms, *and* that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that, in fact, were imposed. *Id.* at 164, 132 S.Ct. 1376.

On appeal, Reynolds does not propound the argument that there is a reasonable probability that, had the plea offer been presented to the court, the court would have accepted its terms. Instead, Reynolds focuses strictly on the second prong, that the conviction or sentence

would have been less severe under the terms of the plea offer; but because he fails to address an element of required analysis, we reject his argument. However, even if Reynolds had addressed the first prong, his argument still fails. Reynolds has consistently maintained his innocence, and Hall disputed Reynolds's statement that he told Hall many times that he would accept the State's offer of ten years. This court does not assess the credibility of the witnesses. *Hoyle v. State*, 2011 Ark. 321, at 6, 388 S.W.3d 901, 906. Conflicts in testimony are for the fact-finder to resolve, and the court is not required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Id.* The trial court's denial of relief on this point was not clearly erroneous.

2. *Failure to investigate or call witnesses to challenge BB's and DS's credibility*

With respect to an ineffective-assistance-of-counsel claim regarding the decision of trial counsel to call a witness, such matters are generally trial strategy and outside the purview of Rule 37.1. *Banks v. State*, 2013 Ark. 147. When a petitioner alleges ineffective assistance of counsel for failure to call witnesses, it is incumbent on the petitioner to name the witness, provide a summary of the testimony, and establish that the testimony would have been admissible into evidence. *Wertz v. State*, 2014 Ark. 240, at 4, 434 S.W.3d 895, 900 (citing *Moten v. State*, 2013 Ark. 503 (per curiam)). To demonstrate prejudice, the petitioner is required to establish that there was a reasonable probability that, had counsel performed further investigation and presented the witness, the outcome of the trial would have been different. *Hickey v. State*, 2013 Ark. 237, 428 S.W.3d 446. Trial counsel must use his or her best judgment to determine which witnesses will be beneficial to the client. *Id.* Nonetheless, such strategic decisions must still be supported by reasonable professional judgment. *Id.* Finally, "[w]hen assessing an attorney's decision not to call a particular witness, it must be taken into account that the decision is largely a matter of professional judgment which experienced advocates could endlessly debate, and the fact that there was a witness or witnesses that could have offered testimony beneficial to the defense is not in itself proof of counsel's

ineffectiveness." *Johnson v. State*, 325 Ark. 44, 49, 924 S.W.2d 233, 236 (1996).

Here, counsel testified that he chose not to call four witnesses that Reynolds identified who would have testified that DS and BB were the abusers in their relationships and harassed him after they broke up. Hall explained that if he had called Reynolds's girlfriend to testify regarding the victims' alleged stalking of Reynolds, she would be seriously impeached. Hall regarded the testimony that Reynolds anticipated from some of the witnesses—including that BB faked a pregnancy and miscarriage—would alienate the jury because it was a "cheap shot." Hall considered other evidence as irrelevant, such as testimony that BB followed him when she had a protective order against him. He explained that it is common for people to violate protective orders, and the protective order was against Reynolds, not BB. Hall stated that he did not call witnesses to testify about the contents of the cell phone because the proposed witnesses had no knowledge of the contents of the cell phone. As to the testimony regarding Reynolds's having never had a seizure, Reynolds had already testified to this, and the proposed witnesses could not meaningfully testify on this matter. We cannot conclude that the trial court was clearly erroneous in determining that counsel's decision was one of reasonable trial strategy and that appellant therefore failed to satisfy his burden to prove trial counsel's performance was deficient under *Strickland*. Even if trial counsel's tactical choices had been different with the benefit of hindsight, the fact that the strategy was unsuccessful does not render counsel's assistance ineffective. *Veneros-Figueroa*, 2021 Ark. App. 144, 623 S.W.3d 122. Accordingly, we affirm on this point.

### 3. *Failure to investigate and present evidence regarding lost cell-phone contents*

Counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary; but where a petitioner under Rule 37.1 alleges ineffective assistance for failure to perform adequate investigation, he must delineate the actual prejudice that arose from the failure to investigate and demonstrate a reasonable probability that the specific materials that would have been uncovered with further investigation could have

changed the trial outcome. *See Hickey*, 2013 Ark. 237, 428 S.W.3d 446; *see also State v. Harrison*, 2012 Ark. 198, 404 S.W.3d 830. The burden is entirely on the claimant to provide facts that affirmatively support his or her claims of prejudice; neither conclusory statements nor allegations without factual substantiation are sufficient to overcome the presumption that counsel was effective, and such statements and allegations will not warrant granting postconviction relief. *Abernathy v. State*, 2012 Ark. 59, 386 S.W.3d 477 (per curiam).

Hall testified that he told French and Reynolds how to retrieve cell-phone contents from the cloud. The cell phone was not in the State's possession, and there was testimony that the phone had been stolen or lost and was irretrievable. At trial, Hall cross-examined BB about the cell phone, and she testified that she took the phone the night of Reynolds's arrest, gave it to a friend of a friend to try to obtain the information on the phone, and she never saw the phone again. Reynolds testified on direct examination that there were photographs and texts on the phone that would show that he and the victims engaged in consensual rough sex, and the victims physically abused, threatened, and harassed him. The trial court found that

> [t]his court is unaware of any requirement that defense counsel must track down and locate a phone or any other evidence that is not in possession of the State or any of the parties in the case. There was no more investigation that Mr. Hall could have done to obtain the content of the phone.

The trial court also found that at the trial, Hall examined one of the proposed witnesses regarding the phone, and he "provided no first-hand knowledge of the contents of the phone" as was true of the remainder of the witnesses. The court found that neither the cell phone "nor its content was available to be introduced" and Reynolds did not meet the burden of proving that Hall's conduct fell below an objective standard of reasonableness or that the outcome of the trial would have been different but for Hall's error. We agree and find that the trial court did not clearly err in denying Reynolds's petition on this basis.

### 3. *Failure to adequately cross-examine witnesses*

In Reynold's final point on appeal, he alleges error in the trial court's finding that counsel was not ineffective for failing to vigorously cross-examine the victims regarding their engagement in consensual rough sex with him when they were together. Reynolds alleges that Hall should have elicited their corroborating testimony that they willingly engaged in bondage sex with him, assuming they would admit to it. The trial court addressed this issue in its order, finding that Hall had cross-examined DS and BB, and there was not a reasonable probability that more aggressive cross-examination would have changed the outcome of the trial.

Here counsel testified that he chose not to further cross-examine DS or BB because if he did not question them about their sexual habits with Reynolds, his testimony would remain unrebutted. Moreover, Hall explained, there was no guarantee that either woman would agree that they willingly engaged in rough sex with Reynolds or that the jury would infer that because they engaged in rough sex with Reynolds at one time in their relationship, the crimes he was accused of did not occur. Hall's decision to forgo a more aggressive cross-examination was a part of his overall defense strategy to provide an alternate explanation for BB's and DS's testimony regarding physical, mental, and sexual abuse and kidnapping.

As in the previous point, to overcome the presumption that counsel's decision was based on reasonable professional judgment and satisfy the second prong of the *Strickland* test, appellant must have identified specific inconsistencies that were sufficient to alter the outcome of the trial. *See Small v. State*, 371 Ark. 244, 264 S.W.3d 512 (2007). We cannot say that the trial court clearly erred in finding that counsel's decision not to more aggressively cross-exam the witnesses was not sufficient to alter the outcome of the trial or that counsel was not ineffective for failing to vigorously cross-examine the victims on their prior bad behavior or consensual rough sex; therefore, Reynolds has not demonstrated error in the trial court's denial of postconviction relief, and we affirm on this point as well.

*Reynolds v. State*, 2023 Ark. App. 106, 2–21.

There is no dispute that the "clearly established Federal law" in this instance is *Strickland v. Washington*, 466 U.S. 688 (l983), requiring a petitioner to prove that (l) his attorney's actions were unreasonable when viewed in the totality of the circumstances; and (2) he was prejudiced because there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. The Arkansas Court of Appeals specifically cited *Strickland* in its ruling.

Having carefully reviewed the trial transcript, the Rule 37 transcript, the trial court's Rule 37 decision, and the thorough Arkansas Court of Appeals' decision, the Court concludes the state court decision was not contrary to, or an unreasonable application of, *Strickland*. The Court is mindful that factual determinations made in state court are presumed to be correct, and Reynolds bears the burden of overcoming this presumption of correctness "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Thus, the credibility assessments of the witnesses[1] who testified at the Rule 37 hearing are presumed correct unless Reynolds overcomes these findings by clear and convincing evidence. *See Thompson v. Keohane*, 516 U.S. 99, 110-11 (1995). He fails in this regard.

---

[1] Some examples of the numerous credibility determinations made by the trial court: "The defendant now testifies that he told Mr. Hall he would have taken a plea on numerous occasions. The Court finds the defendant's testimony uncredible." Doc. No. 6-6, pages 98-99. "This Court finds that Mr. Hall did properly relay the plea offers to the defendant. That Mr. Hall advised the defendant of what testimony and evidence would be presented at the jury trial. That Mr. Hall advised the defendant not to take the plea based on the defendant's defense of innocence. . . This Court does not find the defendant's testimony credible." Doc. No. 6-6. Pages 100-101.

Reynolds contends the Arkansas Court of Appeals' decision was wrong and unreasonable, which the Court construes as an alleged violation of 28 U.S.C. § 2254(d)(2) – that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court." The Court does not agree.

While the credibility of the two victims and Reynolds was critical, other evidence was also compelling. Photographs of the injuries to B.B. and D.S. were weighed by the jury. Reynolds' mug shot was also introduced, and he maintained that his eye was almost swollen shut because B.B. had hit him. Heather Meadows, White County Sheriff's Office, with almost ten years' experience as a sexual assault detective, described D.S. as "visibly shaken . . . very scared . . . very small . . . covered in bruises . . . had a huge black eye." Doc. No. 6-2, page 309. Meadows observed ligature marks and a large burn and described the wounds as defensive in nature.

Regarding credibility, Hall testified at the Rule 37 hearing that Reynolds "testified for a long time and I thought he was fairly credible." Doc. No. 6-7, page 149. Among other things, Reynolds, who was 28, stated "I've only had three loves in my life" – B.B., D.S., and his current fiancé. Doc. No. 6-2, page 330. According to Reynolds, all three loves shared an interest in rough sex. The jury

did not embrace this testimony as an explanation for the restraint of the victims or the injuries, returning a verdict in 77 minutes.  Doc. No. 6-3, pages 123-125.

Finally, Reynolds characterizes the content from the missing cell phone as exculpatory.  This is incorrect.  While the content from the phone may have impugned the victims' credibility it would not disprove their testimony of the events from March and June 2017.  As a result, the alleged content is best described as impeachment, but not exculpatory, evidence.

## Conclusion

*Strickland*, the applicable federal law, demands Reynolds to demonstrate his trial counsel acted unreasonably and that he was prejudiced by his attorney's acts or omissions.  This was the standard to be met in state court.  In the aftermath of the state court decisions denying relief Reynolds was then tasked with a higher standard – showing the Arkansas Court of Appeals decision was contrary to, or an unreasonable application of, *Strickland*, or showing the decision was based on an unreasonable determination of the facts in light of the evidence presented in state court.  The difficulty of meeting this standard was heightened by the presumption that the state court factual determinations were correct.  Reynolds falls short of carrying his burden.  As a result, the Court recommends his petition for writ of habeas corpus be denied, and the case dismissed with prejudice.

Pursuant to 28 U.S.C. § 2253 and Rule 11 of the Rules Governing Section 2554 Cases in the United States District Court, the Court must determine whether to issue a certificate of appealability in the final order. In § 2254 cases, a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). The Court finds no issue on which petitioner has made a substantial showing of a denial of a constitutional right. Thus, the Court recommends that the certificate of appealability be denied.

IT IS SO ORDERED this 6th day of June, 2024.

_____
UNITED STATES MAGISTRATE JUDGE